IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| MARCELINO GEORGE CASTILLO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:09CV864-SRW |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF OPINION**

Plaintiff Marcelino George Castillo brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

**BACKGROUND**

Plaintiff, who was 45 years old when the ALJ issued her decision, last worked as a construction laborer until October 1998, when he went to prison after being convicted on drug charges. (R. 16, 110, 121-22, 244). In a physical examination conducted by the State of Florida Department of Corrections in March 2001, plaintiff reported a history of Hepatitis C, gastrointestinal reflux disease (GERD), a previous back injury with occasional moderate non-radiating lower back pain, and frequent headaches due to poor vision. He was diagnosed

with heartburn and an unspecified "visual disturbance."[1]   Blood testing was positive for

Hepatitis C.   He was referred for an "eye consult" and prescribed Prevacid.  (R. 174-93). In

a mental status examination conducted the following day, plaintiff's mental status was

determined to be within normal limits, and he reported no history of or need for psychiatric

treatment.  (R. 168-73).  During his optometry consultation in April 2001, plaintiff reported

a history of  "[l]ong term myopia" – *i.e.* nearsightedness[2] – and "[l]ost glasses."  Plaintiff's

vision was measured at 20/70 in both eyes.  (R. 178). His eyes were determined to be healthy,

and he was diagnosed with "myopia w/ astigmatism" and given a prescription for glasses.

(R. 178-80).

On February 4, 2004, while he was incarcerated in Alabama, plaintiff sought mental

health treatment for anxiety.  He was referred to Dr. Kern to rule out bipolar disorder.  By

the time of his appointment with Dr., Kern on February 24, 2004, however, plaintiff reported

that he was "100% better." Dr. Kern diagnosed Adjustment Disorder, depressed - "now

resolved" and a history of methamphetamine dependence.  He found that no medication was

indicated and advised plaintiff to follow up as needed with the Department of Corrections

therapist. (R. 204-05). Plaintiff also sought treatment on five occasions in 2004 for

complaints of reflux or heartburn, or to have his prescription for Zantac refilled.  He further

sought treatment on a couple of occasions for skin irritations. (R. 199-203).  In 2005, plaintiff

---

[1] The examination of plaintiff's eyes during the physical examination resulted in "normal" findings, except that his vision was recorded as 20/200 in both eyes.  (R. 175).

[2] See *Stedman's Medical Dictionary* (26th ed. 1995) at p. 1170 (myopia).

was treated once for acid reflux and once for a small scrotal sore. (R. 198-99). In February 2006, plaintiff was hospitalized for an acute viral illness. (R. 197-98). On February 28, 2006, after his discharge from the hospital, he reported that he had experienced back pain since he passed out and fell during the viral illness. In March 2006, plaintiff continued to complained of pain in his lower back and right buttock. The doctor assessed right buttock tenderness and noted a questionable left straight leg raise. (R. 197). A lumbar spine x-ray showed well-aligned vertebrae, well-maintained intervertebral disc spaces, and no evidence of fracture, subluxation or destructive bone disease. It showed evidence of "hypertrophic spurring," but "no other significant findings." (R. 227). Hip and knee x-rays showed no abnormalities. (R. 225).

In May 2006, plaintiff reported for follow-up, indicating that he was "generally better," but that the Indocin he was taking hurt his stomach. The doctor discontinued his Indocin, increased his Zantac prescription and scheduled plaintiff for a follow-up in four months. In August 2006, plaintiff complained of increased back pain. The doctor noted spasms of the upper back and decreased range of motion of the PIP joint of plaintiff's left fourth finger. He diagnosed back spasms and "[left] 4th trigger finger" and prescribed Flexeril and Motrin. (R. 195-96). In November 2006, plaintiff sought treatment for acid reflux. He was diagnosed with GERD, and warned to avoid caffeine, tomatoes and spicy foods, and eating prior to bed time. He was advised to quit smoking, and his prescription for Zantac was increased. (R. 194).

After his release from prison, plaintiff sought treatment on three occasions from Dr.

Davis at Yellow Bluff Health Center – in January 2007 for a complaint of testicle pain, in

February 2007 for a complaint of abdominal pain, and in March 2007 for a complaint of

groin pain. (R. 228-37). A note for the March 16, 2007 visit indicates, "Need urology," "No

work until further notice," and to follow up in six weeks or as needed. (R. 231). Plaintiff

did not return to Dr. Davis.[3]

On April 2, 2007, plaintiff filed an application for Supplemental Security Income

(SSI), asserting disability on the basis of "Hepatitis c, groin problems, arthritis, [and] acid

reflux." (R. 221). A scrotal ultrasound ordered by an ER physician at Southeast Alabama

Medical Center in May 2007 for "Groin/Testicular pain" indicated "no significant findings."

(R. 295-96). In July 2007, Dr. Sam Banner performed a consultative physical examination.

Plaintiff reported "decreased near vision bilaterally," and Dr. Banner measured his far vision

to be 20/40 corrected in both eyes, and his near vision to be 20/100 uncorrected in both eyes.

(R. 238, 239). Plaintiff reported a past history of gastric ulcer disease, but did not include

it among his current chief complaints. (R. 238). He also reported a past history of

"[t]riggering of left ring finger" but, on examination, Dr. Banner noted that he was "[a]ble

to approximate fingers to thumb bilateral[ly]." (R. 238, 240). Lumbar x-rays showed "[e]arly

proliferative changes L1 and L2," but also showed intact pedicles, maintained disc spaces,

and no fracture or dislocation. (R. 242). Dr. Banner diagnosed a right inguinal hernia, which

he noted was "minimal." (R. 239, 241). He further listed "by history" diagnoses of Hepatis

C, chronic low back pain, prior substance abuse with rehabilitation, and triggering left fourth

---

[3] Plaintiff obtained treatment from Dr. Davis at Yellow Bluff Health Center while plaintiff was residing in a half-way house. He was discharged from the half-way house on June 21, 2007. (See R. 238).

finger. (R. 241).

In July 2007, plaintiff reported to Dr. Robert S. Kline for a consultative mental status examination.  Plaintiff reported that he was "pretty down," and that he was "generally like this everyday."  Dr. Kline observed that he appeared sullen, and "somewhat flat and depressed."  Dr. Kline diagnosed "Mood Disorder, Not Otherwise Specified."  (R. 243-45).

In November 2007, plaintiff was treated at the emergency room after he cut his leg on a piece of tin. (R. 292-93).  In May 2008, plaintiff sought treatment from Dr. Mark Dean for abdominal pain.  Dr. Dean sent plaintiff for an ultrasound, which revealed gallstones.  On follow-up two weeks later, plaintiff reported that his abdominal pain had "gradually gotten worse."  Dr. Dean assessed "[r]ight upper quadrant pain; cholelithiasis" and referred plaintiff to Dr. Fendley for further evaluation.  (R. 299-301, 290-91).  Dr. Fendley evaluated plaintiff on June 4, 2008 and, on June 13, 2008, he performed a laparoscopic cholecystectomy.  (R. 282-89).  Four days later, plaintiff reported continued abdominal pain and Dr. Fendley sent him for an ultrasound.  The ultrasound showed no acute abnormality, other than the prior cholecystectomy.  (R. 277-78).  On July 9, 2008, Dr. Fendley performed a colonoscopy and an upper gastrointestinal endoscopy, with biopsy of the gastric antrum.  Dr. Fendley noted a "medium size hiatal hernia with the EG (esophagogastric) junction" with no esophagitis, "diffuse gastritis in the prepyloric region [of the stomach] . . . [and] edema, in one area that showed stigmata of an old ulcer that was just about healed," and "mild inflammatory change [of the duodenum] consistent with duodenitis."  No abnormalities were noted on the colonoscopy.  Testing for helicobacter pylori bacteria was negative.  Dr. Fendley noted that

plaintiff was to continue on Prevacid.  (R. 272-75).

On February 27, 2009, after the claim was denied at the initial administrative level, an ALJ conducted an administrative hearing. Plaintiff testified that he vomits "just about every day," has bad pains when he gets up and that it takes him "like three hours to get from the bed . . . out of the bedroom."  He has constant diarrhea, but does not take Prevacid because he cannot afford it.  He sought treatment at a free clinic in Dothan, but was turned away because of his disability application.  The hospital referred him to a doctor, who wants money plaintiff doesn't have.  Plaintiff's mother "maxed out" her credit cards paying for his gallbladder surgery.  His mother is sick and is under hospice care and is dying, and she supports plaintiff.  (R. 25-26).  He feels worse than he did before his gallbladder surgery. He cannot afford to go to the doctor and has not sought mental health counseling. He has bad pains in his back due to arthritis, and he has bad pains in his legs and one of his arms "goes to sleep, gets tingling . . . like needles sticking in you."  He cannot sit for long periods of time.  Because of his hepatitis, he has to watch what he eats. (R. 27-28).  He has to lie down a lot during the day and does not sleep well at night.  He gets sick any time he eats and his stomach problems are "really extreme."  (R. 29-30).

The ALJ rendered a decision on March 30, 2009, in which she found that plaintiff suffers from severe impairments including mood disorder, hypertrophic spurring of the lumbar spine, inguinal hernia, duodenitis, gastritis, and a hiatal hernia.  She concluded that he does not have an impairment or combination of impairments that meets or medically equals a listed impairment, and that he retains the residual functional capacity to perform the

6

exertional requirements of light work, with specified nonexertional limitations – that he can have no more than occasional contact with the public only perform simple, routine tasks; only accept non-threatening supervision; and must take five minute breaks every two hours in order to use the restroom.  She determined that he has no past relevant work but that he can perform jobs existing in significant numbers in the national economy, including poultry worker, production assembler, and microfilm document preparer.  Accordingly, she found that he is not under a disability as defined in the Social Security Act.  On July 14, 2009, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ became the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed.  The court does not reweigh the evidence or substitute its judgment for that of the Commissioner.  Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings.  Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991).  Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Cornelius, 936 F.2d at 1145.  Factual findings that are supported by substantial evidence must be upheld by the court.  The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied.  Davis, 985 F.2d at 531.  If the court finds an error in the ALJ's application of the law, or if the ALJ fails

to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed.  Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

The plaintiff raises two challenges to the Commissioner's decision, arguing that: (1) the ALJ erred in his consideration of the opinion of plaintiff's treating physician at Yellow Bluff Health Center[4] restricting plaintiff to "No work until further notice"; and (2) the ALJ failed to consider plaintiff's vision impairment properly at step two (severity) and step four (residual functional capacity) of the sequential analysis and should have ordered a consultative eye examination.

### Plaintiff's Vision Impairment

Plaintiff devotes most of his brief to his argument that the ALJ erred in assessing his visual impairment and resulting limitations.  (Plaintiff's brief, pp. 4-12).  However, plaintiff did not allege – either in his application or in his testimony before the ALJ – that his vision impairment affects his ability to work.  (See R. 23-30, 121, 159).  Plaintiff was represented by counsel at the hearing; she made an opening argument to the ALJ, in which she listed plaintiff's diagnoses and problems, making no reference to plaintiff's vision.  (R. 21-23). Under these circumstances, the ALJ was not required to consider plaintiff's vision impairment. See Robinson v. Astrue, 2010 WL 582617, * 2 (11th Cir. Feb. 19, 2010)(unpublished opinion)("Here, Robinson, who was represented at the hearing before the ALJ, did not allege that she was disabled due to CFS either when she filed her claim or at her

---

[4] Plaintiff's counsel refers to this physician as "Dr. Smith." The treatment notes indicate that plaintiff was treated by Dr. Glenton Davis. (See R. 231, 233).

May 2006 hearing. Consequently, the ALJ had no duty to consider Robinson's CFS diagnosis.")(citing  Pena v. Chater, 76 F.3d 906, 909 (8th Cir.1996) for its "holding that a claimant's failure to list an impairment, either in her application for disability benefits or through her testimony, disposes of the claim, because the ALJ was under no 'obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability'").  Plaintiff's after-the-fact argument regarding his visual acuity is, accordingly, without merit.

Additionally – while plaintiff correctly argues that the jobs identified by the ALJ at step five require "near acuity" – there was no evidence before the ALJ suggesting that plaintiff's near vision, including any deficiencies caused by his astigmatism, is not corrected by his eyeglasses.  While Dr. Banner recorded plaintiff's uncorrected near vision as 20/100 bilaterally, his report includes no indication of plaintiff's corrected near acuity. (R. 239). Plaintiff's prison medical record reflects that eyeglasses were prescribed for him in 2001, when his vision was recorded during his physical examination as 20/200 bilaterally and, during his consultative vision examination, as 20/70 bilaterally with astigmatism. (R. 179-80)(consultation request asking that vision examiner "[p]lease recheck and prescribe glasses" and note that "Rx given" after vision examination). In July 2007, the consultative psychologist noted that plaintiff "wore glasses during the interview and reported wearing them at all times." (R. 244).  As noted above, plaintiff and his attorney made no reference whatsoever to plaintiff's vision during the hearing. Plaintiff did not indicate that his eyeglasses do not correct his near acuity adequately.

As noted above, the ALJ had no duty to consider plaintiff's vision impairment (see Robinson, *supra*). Even if she had such a duty, there was nothing in the record to demonstrate that plaintiff's glasses do not adequately correct his near acuity and, accordingly, the ALJ did not err by failing to find plaintiff's vision impairment to be "severe," by failing to order a consultative examination, or by omitting visual limitations from her residual functional capacity assessment.

### Dr. Davis' Opinion

Plaintiff points to Dr. Davis' March 16, 2007 note stating "No work until further notice."  He argues that there is "no indication in the record that this restriction has been lifted," and suggests that "the ALJ may have overlooked a crucial restriction" placed on plaintiff by his physician.  He contends that the ALJ's statement that no restrictions to less than a light exertional level "have been recommended by the treating or examining doctors" reflects that the ALJ failed to consider Dr. Davis' restriction to "no work until further notice." Plaintiff argues that, because the ALJ failed to discuss this treating physician's opinion and failed to articulate any reasons for giving it less weight, Dr. Davis' opinion is due to be accepted as true and this action remanded for an award of benefits.  (Plaintiff's brief, pp. 4-6).

Plaintiff equates the instruction "no work until further notice" with a medical opinion that plaintiff remains unable to work, since Dr. Davis never "lifted" the restriction. (Plaintiff's brief, p. 4). To the extent Dr. Davis' restriction expresses his opinion that plaintiff is unable to work, it is an opinion on an issue reserved to the Commissioner and, accordingly,

it is not treated as a "medical opinion" under the Commissioner's regulations. See 20 C.F.R.

§ 416.927(e), (e)(1). The Commissioner does "not give any special significance to the source

of an opinion on issues reserved to the Commissioner[.]" See  20 C.F.R. § 416.927(e)(3).

Thus, even though Dr. Davis was a treating physician, his opinion of "no work" is not

entitled to the deference generally accorded to the medical opinions of treating sources.

As plaintiff notes, the ALJ did not discuss Dr. Davis' restriction of March 16, 2007.

(Plaintiff's brief, p. 5). Even if the restriction is not due to be treated as a treating physician's

medical opinion under 20 C.F.R. § 416.927(d)(2), the ALJ arguably should have discussed

it. See SSR 96-5P ("Treating source opinions on issues reserved to the Commissioner will

never be given controlling weight. However, the notice of the determination or decision must

explain the consideration given to the treating source's opinion(s)"). However, even

assuming that the ALJ erred by failing to discuss the restriction, her failure to do so does not

constitute reversible error. "[W]hen an incorrect application of the regulations results in

harmless error because the correct application would not contradict the ALJ's ultimate

findings, the ALJ's decision will stand." Wright v. Barnhart, 153 Fed. Appx. 678, 684 (11th

Cir. 2005)(citing Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir.1983)). In Wright, the

Eleventh Circuit found that the ALJ's failure to indicate the weight he gave to the opinions

of certain physicians was harmless error, because those opinions did not directly contradict

the ALJ's findings. Id.

In the present case, even if Dr. Davis' opinion of "no work until further notice" were

given controlling weight, it would not result in a finding of disability. Contrary to plaintiff's

11

argument, Dr. Davis' language – "until further notice" – implies that Dr. Davis did not view the disability as permanent or long-term. See also R. 235 (Dr. Davis noted plaintiff's "[right] groin pain" on an office form under the heading "Acute Problems" and not under "Chronic Problems"). Dr. Davis restricted plaintiff from work at the March 16, 2007 visit. Although plaintiff was to follow up with Dr. Davis in six weeks (see R. 231), he did not do so. The record includes no further treatment by Dr. Davis after March 16th. Dr. Davis did not have any opportunity to modify or lift the restriction. His failure to do so, accordingly, does not indicate that the restriction from work is ongoing, or that it was expected to last more than twelve months, as would be required to mandate a finding of disability.

Additionally, later medical evidence from other sources suggest that plaintiff's acute symptoms treated by Dr. Davis abated within a couple of months of the March 16, 2007 office visit. When plaintiff first complained to Dr. Davis of pain in his right testicle, Dr. Davis assessed epididymitis and gave plaintiff a prescription for Doxycycline, 100 mg. (R. 230). However, at the time of plaintiff's next follow-up visit two weeks later, Dr. Davis was concerned that plaintiff might have a hernia and recommended that he follow-up with his family doctor and obtain a CT scan of his abdomen/pelvis. (See R. 233). When plaintiff returned to Dr. Davis complaining of groin pain five weeks later, on March 16, 2007, Dr. Davis assessed "[right] groin pain," and noted "[n]eed urology" and "[n]o work until further notice." (R. 228, 231-32).

As noted above, plaintiff did not return to Dr. Davis. However, plaintiff had a scrotal ultrasound at Southeast Alabama Medical Center on May 25, 2007 due to his

"Groin/Testicular pain." (R. 296). Although the radiologist noted a "[t]iny left epididymal cyst,"[5] he observed no hydrocele and noted no other irregularity of either testicle. His conclusion was "no significant findings." (R. 296). Thus, as of May 25, 2007, there was no ultrasound evidence of epididymitis, indicating either that the condition had responded to the antibiotic treatment or that Dr. Davis initial impression that plaintiff's testicle pain was due to epididymitis was incorrect. When plaintiff returned to Dr. Davis with continued pain at his two-week follow-up, Dr. Davis was concerned that plaintiff might instead have a hernia. (R. 233). During plaintiff's consultative physical examination with Dr. Banner on July 9, 2007 – less than four months after Dr. Davis last treated the plaintiff and imposed the restriction at issue – plaintiff did not complain of current testicular or groin pain,[6] but reported a history of right inguinal hernia. (R. 238). On examination, Dr. Banner noted a "[m]inimal right inguinal hernia" (R. 239). The ALJ found plaintiff's inguinal hernia to be one of his severe impairments (R. 10), and expressly noted that "in light of this diagnosis [of right, inguinal hernia]" plaintiff was "limited to lifting and carrying no more than 10 pounds frequently and 20 pounds occasionally." (R. 13). Since plaintiff's acute symptoms of right groin and/or testicular pain resulting from the hernia had abated within a few months of Dr. Davis' "no work until further notice" restriction, the restriction – fully credited – would not result in a finding of disability.[7] Accordingly, any error made by the ALJ in

---

[5] Plaintiff complained of pain in his right testicle, not his left. (R. 230).

[6] Dr. Banner notes plaintiff's "Chief Complaints" to include present complaints of a diagnosis of Hepatitis C, fatigue, and low back pain resulting in difficulty walking, standing and laying. (R. 238, ¶ I(A)).

[7] At the time of his hearing, plaintiff testified that he experiences "extreme" stomach pain, but he did not mention groin or testicular pain. (R. 25-30). Plaintiff stated, "I don't even feel my hernia anymore

13

failing to discuss the work restriction imposed by Dr. Davis on March 16, 2007 is harmless

and does not warrant reversal.

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the

Commissioner is supported by substantial evidence and proper application of the law and,

accordingly, that it is due to be affirmed.  A separate judgment will be entered.

Done, this 27th day of May, 2010.


/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

---

because my stomach hurts all the time." (R. 30).  In her opening statement to the ALJ, plaintiff's attorney also did not refer to plaintiff's inguinal hernia, or to any groin or testicular pain resulting from the inguinal hernia.  (R. 21-23).